ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA   :

              :

       - v. -        :   **SEALED**

              :   **INDICTMENT**

ALI FAYAD,           :

FAOUZI JABER,       :   S1 13 Cr. 485

  a/k/a "Excellence," and  :

KHALED EL MEREBI,      :

  a/k/a "Short,"      :

  a/k/a "Papa Natal,"   :

              :

         Defendants.   :

- - - - - - - - - - - - - - - - - X

## BACKGROUND

### THE FARC

    1.    From in or about 1964 until on or about the date of filing of this Indictment, the Fuerzas Armadas Revolucionarias de Colombia (hereinafter, the "FARC") has been and is an international terrorist group dedicated to the violent overthrow of the democratically elected Government of Colombia.  Since its inception, while continuing to engage in bombings, massacres, kidnappings, and other acts of violence within Colombia, the FARC also evolved into the world's largest supplier of cocaine.  The FARC was designated as a foreign terrorist organization ("FTO") in October 1997 by the United States Secretary of State and remains so designated as of the date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3|26|14

of the filing of this Indictment.  The European Union also has designated the FARC as a terrorist organization.

2.    During at least the ten years prior to the date of filing of this Indictment, the FARC has directed violent acts against United States persons and property interests in foreign jurisdictions, including, but not limited to, Colombia.  In order to protect its financial interests in the cocaine trade, the FARC leadership ordered its members to take counter measures against the Government of Colombia's cocaine fumigation campaign, including, among other actions:  attempting to shoot down fumigation aircraft; forcing members and supporters to publicly rally against fumigation; and attacking Colombian infrastructure.  Having recognized that the United States contributed significantly to Colombian fumigation efforts, the FARC leadership ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.

3.    The FARC's violent acts directed against the United States and United States interests have included: (1) the murder of United States nationals; (2) the kidnapping of United States nationals; and (3) the bombing of a restaurant in Bogota, Colombia, frequented by United States nationals.

2

THE DEFENDANTS

4.    At all times relevant to this Indictment, ALI FAYAD, the defendant, was a weapons trafficker based in the Ukraine, represented by FAOUZI JABER, a/k/a "Excellence," the defendant, to have ties to Hezbollah, a designated FTO based in Lebanon;  JABER was a narcotics trafficker based in West Africa, who also claimed to have ties to Hezbollah; and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendant, was a narcotics trafficker also based in West Africa.

5.    FAOUZI JABER, a/k/a "Excellence," the defendant, introduced ALI FAYAD and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, to individuals who identified themselves as representatives and/or associates of the FARC, but who were, in fact, confidential sources (the "CSs") working for the United States Drug Enforcement Administration ("DEA").  During a series of meetings with the CSs, FAYAD and JABER agreed to provide weapons, including surface-to-air missiles, to the FARC for use by the FARC against American forces in Colombia.  In addition, JABER and EL MEREBI agreed to assist the FARC with the transportation and storage of FARC-owned cocaine in West Africa and with the laundering of narcotics proceeds.

3

<u>COUNT ONE</u>

<u>CONSPIRACY TO KILL OFFICERS AND EMPLOYEES OF THE UNITED STATES</u>

The Grand Jury charges:

6.   From at least in or about October 2012, up to and including in or about March 2014, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ALI FAYAD and FAOUZI JABER, a/k/a "Excellence," the defendants, who will be first brought to and arrested in the Southern District of New York, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to kill officers and employees of the United States, while such officers and employees were engaged in and on account of the performance of official duties, and any person assisting such officers and employees in the performance of such duties and on account of that assistance, in violation of Title 18, United States Code, Section 1114.

7.   It was a part and an object of the conspiracy that ALI FAYAD and FAOUZI JABER, a/k/a "Excellence," the defendants, and others known and unknown, agreed to provide the FARC with weapons to be used, among other things, to kill officers and employees of the United States, and persons assisting such officers and employees in the performance of official duties, in Colombia.

4

## Overt Acts

8.   In furtherance of the conspiracy and to effect the
illegal object thereof, ALI FAYAD, FAOUZI JABER, a/k/a "Excellence,"
and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the
defendants, committed the following overt acts, among others:

a.   On or about October 17, 2012, in Accra, Ghana,
JABER, the defendant, met with two confidential sources ("CS-1" and
"CS-2"), acting at the direction of the DEA.  During the meeting,
which was recorded, JABER stated, in sum and substance, that he could
provide the FARC with (1) weapons for use against the Colombian
Government and American forces in Colombia; (2) assistance in storing,
transporting, and providing security for FARC-owned cocaine in
Africa; and (3) assistance with laundering narcotics proceeds.

b.   On or about November 17, 2012, in Accra, Ghana,
JABER met again with CS-1 and CS-2.  During the meeting, which was
recorded, JABER advised, in sum and substance, after being informed
that the FARC was engaged in narcotics trafficking and that some of
the narcotics were transported to New York, that JABER was capable
of moving money from other locations to New York for the FARC.
Regarding the previously discussed weapons transaction, JABER
explained, in sum and substance, that he would reach out to his weapons
suppliers after CS-2 sent him a list of the particular weapons needed.

5

    c.   On or about November 18, 2012, in Accra, Ghana, JABER met again with CS-1 and CS-2.  During the meeting, which was recorded, JABER asked CS-2 to provide JABER with the location where the weapons would be delivered.

    d.   On or about November 30, 2012, JABER spoke to CS-1 on the telephone.  During the telephone call, which was recorded, JABER confirmed, in sum and substance, that he had received the requested weapons list via email and would provide it to his weapons suppliers.  The email JABER received contained a list of the weapons sought by the FARC, including, among other items, surface-to-air missiles, assault rifles, grenade launchers, and grenades.

    e.   Throughout December 2012, JABER exchanged a series of emails with an account he believed to be used by CS-2.  In the emails, among other things, JABER inquired, in sum and substance, whether the FARC was interested in new or used weapons and where the weapons would be delivered.  JABER also requested information so that he could assist the FARC in laundering narcotics proceeds, including the number and location of bank accounts in Europe, Africa and the United States that would be used.

    f.   On or about January 17, 2013, in Accra, Ghana, JABER and MEREBI, the defendants, met with CS-1, CS-2, and a third confidential source acting at the direction of the DEA who purported

to be a weapons expert for the FARC ("CS-3").  During the meeting, which was recorded, the following overt acts occurred:

   i.   Before EL MEREBI joined the meeting, JABER explained, in sum and substance, to CS-1, CS-2 and CS-3, that JABER had traveled to at least two different countries to advance the weapons deal and that the weapons would be obtained from suppliers in Russia, China, Belarus, Iran or Iraq.

   ii.   After EL MEREBI joined the meeting, JABER explained, in sum and substance, that he brought EL MEREBI to the meeting to assist the FARC with narcotics trafficking.

   iii.  After being informed that the FARC's narcotics proceeds fund its fight against Colombian and American forces in Colombia, EL MEREBI advised, in sum and substance, that he could assist the FARC with narcotics trafficking through his connections at a port in West Africa and by providing advice regarding narcotics transportation logistics.  EL MEREBI also advised the CSs, in sum and substance, that the CSs should first send containers of innocuous goods, such as plates, as a test shipment, prior to shipping any narcotics.  EL MEREBI further explained, in sum and substance, that the CSs should then send the actual narcotics in a second shipment of two containers, one of which would contain only plates, and the other of which would contain plates and narcotics.  EL MEREBI further

7

advised, in sum and substance, that the CSs should use coded language, such as referring to cocaine as "shirts".

        iv.  JABER then reiterated, in sum and substance, that he could assist the CSs in laundering their narcotics proceeds by transferring cash to the United States.  To that end, JABER advised that he could introduce CS-2 to individuals who owned a company in West Africa that could be used to facilitate the transfer of money.  JABER then agreed to receive a sum of United States currency in Ghana and send a portion of it to New York.

        v.  To provide further assistance, JABER stated, in sum and substance, that he would rent villas to store FARC-owned cocaine in West Africa.  EL MEREBI then discussed, in sum and substance, that he could help create a legal business in West Africa that could be used to provide a cover for the transportation of narcotics through West Africa.

        g.  On or about March 10, 2013, in Accra, Ghana, JABER and EL MEREBI met with CS-1 and CS-2.  During the meeting, which was recorded, the following overt acts occurred:

        i.  JABER and EL MEREBI received approximately $200,000 in United States currency from the CS-1 to launder on behalf of the FARC, which was represented to be narcotics proceeds to be used to purchase weapons to fight Americans.  JABER also received an

8

additional $14,000 in United States currency as a commission from CS-1.

> ii.  EL MEREBI showed the CSs information about two companies that EL MEREBI claimed could be utilized to covertly transport narcotics.  EL MEREBI also proposed, in sum and substance, that he could send family members to New York for the purpose of establishing businesses that could be used to facilitate the transportation of narcotics to New York.

> h.  On or about March 11, 2013, in Accra, Ghana, JABER and EL MEREBI met with CS-1 and CS-2.  During the meeting, which was recorded, EL MEREBI provided the CSs with dishware and glassware as a sample of the innocuous products that EL MEREBI proposed using to conceal the shipment of narcotics.

> i.  Between on or about March 11, 2013 and on or about April 15, 2013, JABER and EL MEREBI participated in recorded telephone calls and exchanged emails with CS-1 and CS-2 concerning the transfer of the $200,000 in United States currency to a bank account in New York, New York.

> j.  On or about April 15, 2013, JABER and EL MEREBI caused $199,975 to be deposited into a New York bank account.  This sum represented the funds that the CSs had provided to JABER and EL MEREBI on or about March 10, 2013, less a $25 processing fee.

k.   On or about July 26, 2013, JABER spoke on the telephone with CS-1.  During the call, which was recorded, JABER informed CS-1, in sum and substance, FAYAD, the defendant, would assist CS-1 with the weapons transaction.  JABER described FAYAD as a weapons consultant for the Ukraine.

l.   On or about July 31, 2013, JABER spoke on the telephone with CS-1.  During the call, which was recorded, JABER explained, in sum and substance, that FAYAD had provided JABER with photographs so that JABER could obtain a fake passport for him, which would facilitate his travel for the purposes of engaging in the proposed weapons deal.

m.   On or about October 8, 2013, in Warsaw, Poland, JABER met with CS-1 and CS-2.  During the meeting, which was recorded, JABER discussed the $200,000 money transfer and displayed an African passport that JABER claimed to have procured for FAYAD.

n.   On or about October 9, 2013, FAYAD spoke on the telephone with CS-1.  During the call, which was recorded, FAYAD explained, in sum and substance, that he was unable to attend the October meeting in Warsaw, Poland, but invited CS-1 to travel to the Ukraine to view his weapons inventory.

o.   On or about October 26, 2013, JABER spoke on the telephone CS-1.  During the call, which was recorded, JABER

10

indicated, in sum and substance, that he had recently met with FAYAD to further discuss the weapons deal.

    p. On or about November 16, 2013, in Warsaw, Poland, JABER and FAYAD met with CS-1, CS-2 and a fourth confidential source acting at the direction of the DEA who purported to be a weapons expert for the FARC ("CS-4"). During the meeting, which was recorded, the following overt acts occurred:

    i. After being informed that the CSs represented the FARC and needed weapons to fight American forces in Colombia, FAYAD explained, in sum and substance, that he would provide false documentation to suggest that the weapons were destined for Ecuador.

    ii. FAYAD inquired, in sum and substance, what type of weapons were required, to which the CSs responded that they wanted to purchase, among other things, surface-to-air missiles, surface-to-surface missiles, AK assault rifles, rocket-propelled grenades, and ammunition on behalf of the FARC. In response, FAYAD stated, in sum and substance, that the problem faced by the FARC is that the American and Colombian governments are "shelling with helicopters and other rockets." FAYAD suggested, in sum and substance, that he could provide five hundred (500) Iglas, a Russian-made portable surface-to-air missile, that the FARC fighters could carry on their shoulders.

iii.  After being informed that the CSs were concerned that the American helicopters being used in Colombia were able to evade heat-seeking missiles, FAYAD explained that the Igla would be able to reach its target.

iv.   JABER stated, in sum and substance, that the Americans do not like FAYAD because of FAYAD's connections to Hezbollah and further stated, in sum and substance, that he is an enemy of the United States.

v.   FAYAD further explained, in sum and substance, that he would provide pricing information after the CSs provided a list of the weapons they wished to purchase.  FAYAD also described the timing of payments prior to delivery of the weapons.

vi.   FAYAD stated, in sum and substance, that the CSs should communicate with him concerning the purchase order via email.  FAYAD further explained that, in email correspondence, FAYAD would indicate that the order was destined for Libya, rather than its actual destination.

q.   Between on or about November 21, 2013 and December 6, 2013, within a series of emails, FAYAD provided pricing for, among other items, an "Igla launcher," "igla miss[ile]," "RPG launcher," and an "RPG missile".

r.   On or about December 11, 2013, FAYAD spoke on the telephone with CS-1.  During the call, which was recorded, FAYAD

12

discussed the pricing of the weapons, which FAYAD stated, in sum and substance, included the cost of the false documentation discussed at paragraph 8(p)(i) herein, transportation, and profits for those involved.  FAYAD further explained, in sum and substance, that the CSs must provide fifty percent of the total cost once the order was finalized and prior to delivery.

   s. On or about February 5, 2014, FAYAD received an email that listed the types and quantities of weapons sought by the FARC, which included twenty (20) "Igla Misile[s]" [sic], five (5) "Igla Launcher[s]", two hundred (200) "rpg misile[s]" [sic], fifty (50) "rpg launcher[s]", and various firearms.

   t. On or about February 22, 2014, FAYAD agreed via email to provide, among other things, twenty (20) "Igla Missile[s]", eight (8) "Igla Launcher[s]", four hundred (400) "RPG Rocket[s]", one hundred (100) "RPG Launcher[s]", and various firearms, to the FARC, for a total cost of $8,277,500.

  (Title 18, United States Code, Sections 1117 and 3238.)

COUNT TWO

CONSPIRACY TO ACQUIRE AND TRANSFER ANTI-AIRCRAFT MISSILES

The Grand Jury further charges:

9.    The allegations set forth in Paragraphs One through Five and Eight above are incorporated by reference as if set forth fully herein.

10.   From at least in or about October 2012, up to and including in or about March 2014, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ALI FAYAD, and FAOUZI JABER, a/k/a "Excellence," the defendants, at least one of whom will be first brought to and arrested in the Southern District of New York, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to violate Section 2332g(a)(1)(A) & (B) of Title 18, United States Code.

11.   It was a part and an object of the conspiracy that ALI FAYAD, and FAOUZI JABER, a/k/a "Excellence," the defendants, and others known and unknown, knowingly acquired, transferred directly and indirectly, received, possessed, and exported (1) an explosive and incendiary rocket and missile that is guided by a system designed to enable the rocket and missile to seek and proceed toward energy radiated and reflected from an aircraft and toward an image locating an aircraft, and otherwise direct and guide the rocket and missile

14

to an aircraft and (2) a device designed and intended to launch and guide said rocket and missile, to wit, FAYAD and JABER agreed to acquire and transfer surface-to-air missiles and surface-to-air missile launchers to the FARC to enable the FARC to attack United States aircraft in Colombia, in violation of Title 18, United States Code, Section 2332g(a)(1)(A) & (B).

Overt Acts

12.    In furtherance of the conspiracy and to effect the illegal object thereof, ALI FAYAD, and FAOUZI JABER, a/k/a "Excellence," the defendants, and others known and unknown, committed the overt acts set forth in Paragraph Eight of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 2332g(a)(1)(A) and (B),
(b)(1), (b)(3), (b)(4), (c)(1) and 3238.)

COUNT THREE

CONSPIRACY TO PROVIDE MATERIAL SUPPORT OR RESOURCES TO A FOREIGN
TERRORIST ORGANIZATION

The Grand Jury further charges:

13.    The allegations set forth in Paragraphs One through Five and Eight above are incorporated by reference as if set forth fully herein.

14.    From at least in or about October 2012, up to and including in or about March 2014, in an offense begun and committed

15

outside of the jurisdiction of any particular State or district of the United States, ALI FAYAD, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, at least one of whom will be first brought to and arrested in the Southern District of New York, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, the FARC, which was designated by the United States Secretary of State as a foreign terrorist organization in October 1997, pursuant to Section 219 of the Immigration and Nationality Act, was redesignated as such on October 2, 2003, and October 11, 2005, and is currently designated as such, as of the date of filing of this Indictment.

15.   It was a part and an object of the conspiracy that ALI FAYAD, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, and others known and unknown, would and did provide the FARC with "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b)(1), to include tangible and intangible property, services, financial services, expert advice and assistance, false documentation, and weapons, among other things, knowing that the FARC had engaged and was engaging in terrorist activity (as defined in

16

section 212(a)(3)(B) of the Immigration and Nationality Act), and that the FARC had engaged and was engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B(a)(1).

## Overt Acts

16.    In furtherance of the conspiracy and to effect the illegal object thereof, ALI FAYAD, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, and others known and unknown, committed the overt acts set forth in Paragraph Eight of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code,
Sections 2339B(a)(1), (d)(1)(C), (d)(1)(D), (d)(1)(E), and 3238).

## COUNT FOUR

### CONSPIRACY TO COMMIT MONEY LAUNDERING

The Grand Jury further charges:

17.    The allegations set forth in Paragraphs One through Five and Eight above are incorporated by reference as if set forth fully herein.

18.    From at least in or about October 2012, up to and including in or about March 2014, in the Southern District of New York and elsewhere, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI,

a/k/a "Short," a/k/a "Papa Natal," the defendants, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(3)(A) and (B).

19.   It was a part and an object of the conspiracy that FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of illegal narcotics trafficking, and with the intent to promote the carrying on of illegal narcotics trafficking in violation of United States and foreign law, knowingly would and did conduct and attempt to conduct financial transactions involving property represented to be the proceeds of illegal narcotics trafficking, in violation of Title 18, United States Code, Section 1956(a)(3)(A) and (B).

<u>OVERT ACTS</u>

20.   In furtherance of the conspiracy and to effect the illegal object thereof, that FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, and others known and unknown, committed the overt acts set forth in Paragraph Eight of this Indictment, which are fully incorporated by reference herein.

18

(Title 18, United States Code, Section 1956(h).)

COUNT FIVE

MONEY LAUNDERING

The Grand Jury further charges:

21.   The allegations set forth in Paragraphs One through Five and Eight above are incorporated by reference as if set forth fully herein.

22.   In or about March and April 2013, in the Southern District of New York and elsewhere, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, with the intent to promote the carrying on of specified unlawful activity and to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, did conduct and attempt to conduct financial transactions involving property represented to be the proceeds of specified unlawful activity, and property used to conduct and facilitate specified unlawful activity, to wit, in or about March 2013 and April 2013, JABER and EL MEREBI arranged the transfer from Ghana to Manhattan, New York, of approximately $200,000 that was represented to be the proceeds of illegal narcotics trafficking, and funds to be used to conduct and facilitate illegal narcotics trafficking, in order to promote the carrying on of illegal narcotics trafficking in violation of United States and foreign law, and to

19

conceal and disguise the nature, location, source, ownership, and control of the funds.

(Title 18, United States Code, Sections 1956(a)(3)(A), (B) and 2.)

### COUNT SIX

#### CONSPIRACY TO IMPORT COCAINE INTO THE UNITED STATES

The Grand Jury further charges:

23.  The allegations set forth in Paragraphs One through Five and Eight above are incorporated by reference as if set forth fully herein.

24.  From at least in or about October 2012, up to and including March 2014, in the Southern District of New York and elsewhere, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, who will first enter the United States in the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

25.  It was a part and an object of the conspiracy that FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, and others known and unknown, would and did distribute, and possess with intent to distribute, a controlled substance, to wit, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, intending and

20

knowing that such substance would be imported into the United States from a place outside thereof, in violation of Sections 959, 960(a)(3), and 960(b)(1)(B) of Title 21, United States Code.

### Overt Acts

26.   In furtherance of the conspiracy and to effect the illegal object thereof, that FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, and others known and unknown, committed the overt acts set forth in Paragraph Eight of this Indictment, which are fully incorporated by reference herein.

(Title 21, United States Code, Sections 963 and 959(c).)

### FORFEITURE ALLEGATIONS AS TO COUNTS ONE THROUGH THREE

27.   The allegations contained in Counts One, Two, and Three of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(G), and Title 28, United States Code, Section 2461(c).

28.   The violations of Title 18, United States Code, Sections 1117, 2332g, and 2339B alleged in Counts One, Two, Three, of this Indictment are Federal crimes of terrorism, as defined in 18 U.S.C. § 2332b(g)(5), against the United States, citizens and residents of the United States, and their property.

21

29.   ALI FAYAD, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, were individuals engaged in planning and perpetrating a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property.

30.   Upon conviction of any of the offenses in violation of Title 18, United States Code, Sections 1117, 2332g, and 2339B alleged in Counts One, Two, and Three of this Indictment, ALI FAYAD, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal" (as to Count Three only), the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(G)(i), and Title 28, United States Code, Section 2461(c), all right, title, and interest in all assets, foreign and domestic.

31.   Upon conviction of any of the offenses in violation of Title 18, United States Code, Sections 1117, 2332g, and 2339B alleged in Counts One, Two, and Three of this Indictment, ALI FAYAD, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal" (as to Count Three only), the defendants, shall pay to the United States, pursuant to pursuant to Fed. R. Crim. P. 32.2(b)(1), a money judgment equal to the value of the assets subject to forfeiture under Paragraphs 27 through 30 above.

22

(Title 18, United States Code, Section 981(a)(1)(G) and
Title 28, United States Code, Section 2461(c).)

<u>FORFEITURE ALLEGATION AS TO COUNTS FOUR AND FIVE</u>

32.   As the result of committing the money laundering offenses alleged in Counts Four and Five of this Indictment, FAOUZI JABER, a/k/a "Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa Natal," the defendants, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1), all property, real and personal, involved in the offenses alleged in Count Four and Five of this Indictment and all property traceable to such property.

<u>Substitute Asset Provision</u>

33.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

23

     e.    has been commingled with other

            property which cannot be divided

            without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p),

to seek forfeiture of any other property of the defendants up to the

value of the above forfeitable property.

(Title 18, United States Code, Sections 982, 1956, and 2; Title 21,
United States Code, Section 853(p).)

## FORFEITURE ALLEGATION AS TO COUNT SIX

     34.  As a result of committing the controlled substance

offense alleged in Count Six of this Indictment, FAOUZI JABER, a/k/a

"Excellence," and KHALED EL MEREBI, a/k/a "Short," a/k/a "Papa

Natal," the defendants, shall forfeit to the United States, pursuant

to 21 U.S.C. § 970, any and all property constituting and derived from

any proceeds that the defendants obtained directly and indirectly

as a result of the said violation and any and all property used and

intended to be used in any manner or part to commit and to facilitate

the commission of the violation alleged in Count Six of this

Indictment, including but not limited to, a sum of money representing

the amount of proceeds obtained as a result of the offense described

in Count Six of this Indictment.

24

## Substitute Assets Provision

35.  If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

        a.  cannot be located upon the exercise of due diligence;

        b.  has been transferred or sold to, or deposited with, a third party;

        c.  has been placed beyond the jurisdiction of the court;

        d.  has been substantially diminished in value; or

        e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 970, to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 963 and 970.)

FOREPERSON

PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

- v. -

**ALI FAYAD,**
**FAOUZI JABER, a/k/a "Excellence,"**
**KHALED EL MEREBI, a/k/a "Short,"**
**a/k/a "Papa Natal,"**

> Defendants.

---

**SEALED INDICTMENT**

S1 13 Cr. 485

(18 U.S.C. §§ 2, 1117, 2332g,
2339B, 1956(h), 1956(a)(3), 3238;
21 U.S.C. §§ 963 and 959(c))

---

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson

3/26/14 - Filed Sealed Indictment

Filed Arrest warrants