*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 25, 2018

**BY ECF AND EMAIL**

The Honorable Colleen McMahon
Chief United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

    Re:    *United States* v. *Faouzi Jaber*, S1 13 Cr. 485 (CM)

Dear Chief Judge McMahon:

    The Government respectfully submits this letter in connection with the sentencing of defendant Faouzi Jaber, a/k/a "Excellence" ("Jaber" or the "defendant"), scheduled for February 1, 2018, at 4:00 p.m., and in response to the defendant's sentencing submission, dated January 11, 2018 ("Def. Mem."). The defendant coordinated a scheme to sell an arsenal of military-grade weapons, and to provide cocaine-trafficking and money-laundering services, to men whom he understood to be terrorists, believing that those terrorists would use the weapons and cocaine proceeds to advance their terrorist objectives and kill American soldiers in Colombia. As explained below, the Government respectfully submits that the Court should impose a sentence of 180 months' imprisonment, which is the sentence called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."). Such a sentence would appropriately reflect the seriousness of the defendant's conduct—international weapons trafficking, drug trafficking, and money laundering intended to support terrorists—and serve the need to deter the defendant and others from engaging in such dangerous conduct.

## Background

### I.    Offense Conduct

    The defendant is an Ivorian national who participated in a far-reaching conspiracy to sell millions of dollars' worth of military-grade weapons to the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"), to traffic large quantities of cocaine on behalf of the FARC, and to launder the proceeds of the cocaine trafficking for the FARC. Unbeknownst to the defendant and his co-conspirators, the FARC representatives with whom the defendant negotiated the criminal venture were in fact confidential sources ("CSes") working at the direction of the Drug Enforcement Administration (the "DEA"). The defendant's offense conduct is summarized in

paragraphs 17 through 39 of the Presentence Investigation Report, dated October 16, 2017 (the "PSR"), as to which there is no dispute. *See* PSR at 23.[1]

The DEA began investigating Jaber—who went by "Excellence"—and his network of associates in late 2011. At the DEA's direction, a confidential source ("CS-1"), who knew Jaber, contacted Jaber by phone and conveyed that he had associates in South America who were looking to move cocaine. Over the course of a series of recorded calls, it was arranged that one of Jaber's associates, an unindicted co-conspirator ("CC-1"), would meet with CS-1 in Accra, Ghana on September 25, 2012. At that meeting (which was recorded), CS-1 described a business opportunity involving the supply of weapons, movement of cocaine, and laundering of drug proceeds for the FARC.[2] CC-1 indicated that Jaber could assist, discussed Jaber's connections, and agreed to speak with Jaber about the prospective business. Several days later, on September 29, 2012, CS-1 spoke by phone with Jaber and CC-1. During that recorded call, the three men further discussed the potential weapons, cocaine, and money-laundering venture. Jaber indicated that he was capable of facilitating the business, and cautioned that they should be careful when communicating by phone or email.

A few weeks later, on October 17, 2012, Jaber and CC-1 met in Accra with CS-1 and a second DEA confidential source ("CS-2"), who was posing as a representative of the FARC. *See* PSR ¶ 20. During that meeting (which was recorded), Jaber conveyed that he was capable of facilitating: (1) the supply of weapons to the FARC for use against American and Colombian forces in Colombia; (2) storing, protecting, and transporting FARC-owned cocaine in Africa; and (3) laundering cocaine-trafficking proceeds for the FARC. During a series of recorded calls over the ensuing days, Jaber informed CS-1 that he would discuss the prospective business with another associate ("CC-2"), a pilot who could assist with smuggling operations, and that Jaber would bring CC-2 to the next meeting.

On November 17 and 18, 2012, Jaber and CC-2 met with CS-1 and CS-2 in Accra. *See* PSR ¶¶ 21-22. During those meetings (which were recorded), after being informed that a portion of the FARC's cocaine was transported to New York, Jaber advised that he was capable of moving money for the FARC from overseas locations to New York. With respect to the weapons component of the potential deal, Jaber explained that he would contact his weapons

---

[1] The defendant's offense conduct summarized in the PSR and herein is culled from recorded meetings and phone calls, as well as emails, text messages, and other documentary evidence.

[2] As summarized in the PSR (¶¶ 12-15), at all times relevant to this case, the FARC was a guerilla group dedicated to the violent overthrow of the democratically elected government of Colombia. The FARC used narcotics trafficking to finance its terrorist activities and evolved into the world's largest supplier of cocaine. The FARC has directed violent acts against U.S. persons and property, including the kidnapping and murder of U.S. nationals, in an effort to dissuade the U.S. government from assisting the Colombian government's initiative to fumigate and disrupt the FARC's cocaine manufacturing and distribution activities. In furtherance of its terrorist and narcotics-trafficking activities, the FARC purchased and maintained weapons such as surface-to-air missiles, automatic rifles, machine guns, and explosives. The FARC was designated by the U.S. Secretary of State as a foreign terrorist organization ("FTO") in 1997, and remains designated as an FTO.

suppliers once CS-2 sent Jaber a list of the particular weapons needed. Jaber also asked CS-2 to specify the location where the weapons would be delivered.

Soon thereafter, CS-2 sent an email to Jaber listing the weapons purportedly sought by the FARC. The weapons list provided to Jaber included surface-to-air missiles, assault rifles, grenade launchers, and grenades. On November 30, 2012, during a recorded call with CS-1, Jaber confirmed his receipt of the weapons list that he had requested, and stated that he would provide the list to his weapons suppliers. See PSR ¶ 23.

Throughout December 2012, Jaber continued communicating—via encrypted BlackBerry and email—with CS-1 and CS-2 in furtherance of the planned weapons, narcotics, and money-laundering business. See PSR ¶ 24. In the course of those communications, Jaber inquired whether the FARC was interested in new or used weapons, and again asked for information regarding where the weapons would be delivered. Jaber also requested information to enable him to assist the FARC with laundering drug proceeds, including the numbers and locations of bank accounts in Europe, Africa, and the United States that would be used in the laundering operation. Jaber further advised that he had brought another associate, Khaled El Merebi, a/k/a "Short," a/k/a "Papa Natal" ("El Merebi"), into the venture, and that El Merebi would attend the next in-person meeting. El Merebi is a narcotics trafficker based in West Africa. PSR ¶ 17.

The next in-person meeting took place in Accra on January 17, 2013. See PSR ¶ 25. The participants were Jaber, El Merebi, CS-1, CS-2, and a third DEA confidential source ("CS-3"), who was posing as a weapons expert for the FARC. As set forth in the PSR, in the course of that meeting (which was recorded), the following occurred:

- Before El Merebi arrived, Jaber explained to the CSes that Jaber had visited two different countries to advance the weapons deal, and that the weapons for the FARC would be procured from suppliers in Russia, China, Belarus, Iran, or Iraq.

- When El Merebi arrived, Jaber explained to the group that he had brought El Merebi into the business to assist the FARC with narcotics trafficking.

- The CSes explained that the FARC's cocaine proceeds fund its fight against American and Colombian forces in Colombia. El Merebi advised that he could assist the FARC with cocaine trafficking through his connections at a port in West Africa. El Merebi provided the CSes with detailed instructions regarding the logistics of packaging and shipping the cocaine to ensure that it would not be detected. Jaber added that he would rent villas in West Africa to store the FARC-owned cocaine.

- Jaber reiterated that he could assist the FARC to launder the proceeds of the cocaine smuggling by transferring funds to the United States. Jaber advised that he had connections to a company in West Africa that could be used to facilitate the money laundering. As a test run, Jaber agreed to receive a sum of U.S. currency in Ghana and transfer a portion of the money to New York.

On March 10 and 11, 2013, Jaber and El Merebi met with CS-1 in Accra to initiate the money-laundering transaction. *See* PSR ¶¶ 26-27. In the course of those meetings (which were recorded), Jaber and El Merebi received approximately $200,000 in cash from CS-1 to launder on behalf of the FARC. CS-1 represented that the cash was cocaine proceeds that the FARC would use to purchase weapons to fight American forces. Jaber also accepted payment of $14,000 as a commission for laundering the funds. El Merebi provided CS-1 with information about two companies that could be used to smuggle cocaine, and gave CS-1 a sample of dishware and glassware that El Merebi proposed using to conceal the cocaine shipments.

Over the ensuing month, Jaber and El Merebi, together with another associate ("CC-3"), executed the money-laundering transaction. *See* PSR ¶¶ 28-29. On April 15, 2013, Jaber and El Merebi caused the $200,000 (minus a $25 processing fee) to be wired and deposited into a New York bank account, under the guise of a legitimate transaction involving a front company.

In parallel, Jaber continued working to facilitate the weapons transaction. During a recorded call on July 26, 2013, Jaber informed CS-1 that Ali Fayad, a Ukrainian weapons trafficker with ties to Hizballah, would be the supplier for the weapons deal. *See* PSR ¶¶ 17, 30. During another recorded call several days later, Jaber told CS-1 that he was procuring a fake passport for Fayad to facilitate Fayad's travel for engaging in the planned weapons transaction. *See* PSR ¶¶ 31-32 (at October 8, 2013 meeting in Poland, Jaber showed CS-1 the fake passport that he had procured for Fayad). Jaber met in person with Fayad to discuss the weapons-trafficking deal. *See* PSR ¶ 34. Jaber also began discussing with CS-1 arranging a meeting with Fayad involving the CSes, and Jaber telephonically introduced Fayad to CS-1. *See* PSR ¶ 33.

On November 16, 2013, in Warsaw, Poland, Jaber and Fayad met with CS-1, CS-2, and a fourth DEA confidential source ("CS-4"), who was posing as another weapons expert working for the FARC. *See* PSR ¶ 35. As set forth in the PSR, in the course of that meeting (which was recorded), the following occurred:

- The group discussed that the FARC needed the weapons requested by the CSes to fight American forces in Colombia. Fayad explained that he would provide false documentation to indicate that the weapons were destined for Ecuador.

- Fayad asked about the particular types of weapons needed by the FARC. The CSes advised that the FARC was seeking to purchase surface-to-air missiles, surface-to-surface missiles, AK assault rifles, rocket-propelled grenades ("RPGs"), and ammunition. Fayad stated that the problem faced by the FARC was that American and Colombian forces were "shelling with helicopters and other rockets." Fayad proposed providing 500 Iglas—a Russian-made portable surface-to-air missile—which FARC fighters could carry on their shoulders. Fayad assured the CSes that the Iglas could be used to successfully target American helicopters.

- At one point during the meeting, Jaber referenced Fayad's connections to Hizballah and stated that Fayad was an enemy of the United States.

That same day, Jaber arranged a separate meeting (which was also recorded) at the same Warsaw hotel among CS-1, CS-2, and two Italian men, at which the group discussed collaborating to traffic cocaine. Two days earlier, during a recorded call on November 14, 2013, Jaber had mentioned to CS-1 that he was interested in arranging a meeting for the CSes with Italian drug traffickers to explore another potential cocaine-trafficking opportunity.

Following the Warsaw meeting with Jaber and Fayad, CS-1 continued communicating with Jaber in furtherance of the weapons deal, and also communicated directly with Fayad, who provided details regarding pricing and transportation for the weapons. *See* PSR ¶¶ 36-39. After further negotiations involving Fayad, Jaber, and the CSes, in February 2014, it was agreed via email that Fayad would provide 20 Igla surface-to-air missiles, eight Igla launchers, 400 RPGs, 100 RPG launchers, and various firearms (among other weapons) to the FARC at a total price of $8,277,500. PSR ¶ 39.

Jaber, Fayad, and El Merebi arranged to meet with the CSes on April 5, 2014 in Prague, Czech Republic, to finalize the planned weapons and narcotics transactions. *See* PSR ¶ 40. The three men traveled to Prague, where they were arrested by Czech authorities, at the request of U.S. authorities, based on the charges in this case.

## II.    The Charges, Extradition, and Guilty Plea

Based on the foregoing conduct, Fayad, Jaber, and El Merebi (collectively, the "defendants") were charged in the operative, six-count indictment, S1 13 Cr. 485 (the "Indictment"), with weapons, narcotics, money laundering, and terrorism offenses. *See* Dkt. No. 12. Jaber was charged in all six counts, with: (1) conspiring to kill officers and employees of the United States, in violation of 18 U.S.C. § 1117; (2) conspiring to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. § 2332g; (3) conspiring to provide material support to a designated FTO, *i.e.*, the FARC, in violation of 18 U.S.C. § 2339B; (4) conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h); (5) money laundering, in violation of 18 U.S.C. § 1956(a); and (6) conspiring to import at least five kilograms of cocaine into the United States, in violation of 21 U.S.C. §§ 959, 960(a)(3), and 960(b)(1)(B).

As noted, the defendants were arrested in Prague on April 5, 2014. The U.S. Government thereafter formally requested that the Czech Republic extradite the defendants to the United States to face the charges in the Indictment, and extradition proceedings were commenced in the Czech Republic. However, before the conclusion of those proceedings, in February 2016, the Czech government released Fayad and El Merebi to Lebanon, reportedly as part of a deal to secure the release of five Czech citizens who had been kidnapped in Lebanon. *See* N.Y. Times, Feb. 5, 2016, "5 Czechs Who Were Missing in Lebanon Arrive Home," *available at* https://www.nytimes.com/2016/02/06/world/europe/missing-czechs-lebanon.html.

Following the release of Fayad and El Merebi, extradition proceedings relating to Jaber continued, and he was ultimately extradited to the United States in early April 2016. After the production of discovery, multiple substitutions of counsel, and plea discussions that did not result in a disposition, the Court set a trial date of October 30, 2017. However, in the summer of 2017, Jaber switched course, and decided to accept a plea offer that had been extended by the Government in December 2016. On July 25, 2017, Jaber pled guilty before Magistrate Judge

Katharine H. Parker, pursuant to a plea agreement, to Count Three of the Indictment, which charged him with conspiring to provide material support to the FARC, in violation of 18 U.S.C. § 2339B. Following his plea, Jaber again replaced his counsel, retaining new counsel to take over from the Federal Defenders of New York in connection with sentencing.

### III.     The PSR and the Applicable Guidelines

The applicable Guidelines are not in dispute. As stipulated in Jaber's plea agreement and set forth in the PSR (¶¶ 44-55):

- The base offense level for a violation of the material-support statute is 26, pursuant to U.S.S.G. § 2M5.3(a).

- Because the offense involved the provision of dangerous weapons, firearms, and explosives, as well as funds and other material support or resources with the intent, knowledge, or reason to believe that they would be used to commit or assist in the commission of a violent act, two levels are added pursuant to U.S.S.G. § 2M5.3(b).

- Because the intended victims of the offense were U.S. officers or employees and the offense was motivated by such status, three levels are added pursuant to U.S.S.G. § 3A1.2(a).

- Because the offense is a felony that involved or was intended to promote a federal crime of terrorism, 12 levels are added pursuant to U.S.S.G. § 3A1.4(a).

- A three-level decrease is appropriate to reflect the defendant's acceptance of responsibility and timely notice of his intent to plead guilty, pursuant to U.S.S.G. § 3E1.1.

- Accordingly, the total offense level is 40.

The defendant does not have any known criminal convictions. However, because the offense involved a federal crime of terrorism, the applicable criminal history category ("CHC") is VI, pursuant to U.S.S.G. § 3A1.4(b). PSR ¶¶ 58-59.

An offense level of 40 and a CHC of VI yield a Guidelines range of 360 months to life imprisonment. However, because the statutory maximum term of imprisonment permitted under the version of 18 U.S.C. § 2339B that was in effect during the period of the charged conduct is 15 years, the applicable Guidelines sentence is 180 months' imprisonment. PSR ¶ 111.[3] The Probation Department recommends that the Court impose a Guidelines sentence of 180 months' imprisonment. PSR at 24-25. The defendant asks the Court to impose a sentence of time-served. Def. Mem. at 4.

---

[3] The statutory maximum penalty permitted under the current version of § 2339B is 20 years' imprisonment. *See* 18 U.S.C. § 2339B(a)(1).

**Discussion**

I.  **Applicable Law**

The Guidelines continue to provide important guidance to district courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). While *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must consult the Guidelines and take them into account when sentencing. 543 U.S. at 264. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the applicable Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

II. **The Court Should Impose a Guidelines Sentence of 180 Months' Imprisonment**

The defendant is a sophisticated criminal businessman who coordinated an elaborate, far-reaching scheme to profit through the sale of weapons and the provision of cocaine-trafficking and money-laundering services to a dangerous terrorist organization that has killed Americans. As explained below, a substantial sentence of incarceration, at the applicable Guidelines point of 180 months, is warranted and appropriate to reflect the seriousness of the defendant's conduct and to deter him and others from engaging in such conduct.

*First*, the seriousness of the defendant's conduct is self-evident and indisputable. The defendant worked with an array of criminal associates—including Fayad, El Merebi, CC-1, CC-2, and CC-3—over an extended period of time to supply large quantities of military-grade weapons, as well as other support and resources, to a terrorist organization. In relentless pursuit

of profit, Jaber was prepared to broker and facilitate a multi-million dollar weapons deal aimed at furthering the FARC's reign of terror in Colombia and killing American soldiers.

Not surprisingly, the defense submission repeatedly notes that the FARC was not actually involved in the transaction. That is of course true. What is equally true (and undisputed), and more important, is that the weapons, cocaine-trafficking services, and money-laundering services that the defendants intended to supply were very real. Fayad is a high-level Ukrainian weapons trafficker with ties to Hizballah; El Merebi is an established West African drug trafficker; and Jaber and El Merebi demonstrated their ability to launder large sums of money through the United States during the investigation. *See* PSR ¶¶ 17, 28-29. Moreover, the weapons to be supplied by Fayad in the transaction facilitated by Jaber were military-grade—including surface-to-air missiles, RPGs, and assault rifles—worth over $8 million. PSR ¶¶ 21, 23, 35-39. This was large-scale international weapons trafficking. And as the recorded meetings and calls summarized in the PSR make clear, Jaber fully understood that those weapons would be used by FARC guerillas against American forces. *See, e.g.*, PSR ¶¶ 20, 26(i), 35(ii). Indeed, during multiple meetings, Jaber referenced his own ties to Hizballah, another FTO (and, as discussed above, Fayad was associated with Hizballah). That Jaber appears to have been motivated by money, and not terrorist ideology, *see* Def. Mem. at 18, is not a mitigating factor. Jaber is an international criminal trafficker concerned with making a profit, regardless of whether the contraband involved in the transaction would support and benefit a dangerous terrorist organization, in this case, the FARC. That is a dangerous individual. The DEA appropriately and successfully targeted Jaber and his criminal network, which was revealed to include significant international weapons and drug traffickers such as Fayad and El Merebi.

Nonetheless, the defense submission attempts to portray Jaber as a pitiful, inexperienced novice in the international criminal world, a reluctant participant whose culpability pales in comparison to Fayad and El Merebi. *See, e.g.*, Def. Mem. at 5, 10, 18. That is hardly the case. Of the defendants, Jaber was the driving force, the orchestrator, of the criminal venture. Among other things, Jaber recruited not only Fayad and El Merebi, but also CC-1 (an associate sent by Jaber to meet with CS-1 and discuss the potential criminal business), CC-2 (a pilot with smuggling expertise), and CC-3 (a money-laundering associate), to participate in the operation; Jaber, unlike Fayad and El Merebi, was involved throughout the entire process of planning and negotiating the venture; Jaber was the point of contact for the CSes; and Jaber met no fewer than at least nine different times in various countries with the CSes and co-conspirators in furtherance of the weapons, narcotics, and money-laundering transactions. The hours of recordings in this case reflect the defendant's enthusiasm for the criminal venture, as does his willingness to enlist a cadre of criminal associates to ensure its successful execution. Tellingly, Jaber's actions were not confined to days or weeks but instead represented more than a year of focused effort to achieve the conspiracy's illegal goals. In the midst of the conspiracy, he even arranged a meeting for the CSes with two Italians to explore another potential cocaine-trafficking venture. Moreover, on multiple occasions during the recorded meetings and calls, Jaber alluded to his past criminal exploits, including trafficking narcotics and money laundering. This further belies the notion that he is anything but an experienced and sophisticated international criminal.

Furthermore, contrary to the suggestion in the defense submission, *see* Def. Mem. at 13, Jaber was heavily involved in the negotiation of the weapons deal from start to finish. For

example, Jaber affirmatively requested and received from the CSes a list of weapons purportedly sought by the FARC, so that Jaber could provide the weapons list to prospective weapons suppliers within his network, PSR ¶¶ 21-23; Jaber pressed the CSes to provide details regarding the weapons deal, including delivery location, PSR ¶ 22; by his own account, Jaber traveled internationally to meet with prospective weapons suppliers, PSR ¶ 25(i); Jaber not only recruited Fayad and introduced him to the CSes, but Jaber also communicated and met independently with Fayad to advance the weapons deal, PSR ¶ 34; Jaber participated in the November 16, 2013 meeting with Fayad and CSes in Warsaw at which the details of the types and quantities of weapons to be supplied were discussed, PSR ¶ 35; and Jaber planned to participate with Fayad in the meeting to finalize the deal scheduled for April 5, 2014 in Prague, where the defendants were arrested after arriving for the meeting. Jaber did not waver in his commitment to the deal's execution, traveling far and wide in a determined effort to find the FARC a weapons supplier.

Simply put, and as the defense acknowledges, Def. Mem. at 18, the conspiracy would not have occurred without Jaber. Nor was Jaber's role as the central coordinator and facilitator an accident or fluke. Jaber did not simply happen to know Fayad, El Merebi, CC-1, CC-2, and CC-3. He advised the CSes to use caution when communicating electronically. He traveled the world in furtherance of the venture. He procured a fake passport to facilitate Fayad's travel. His actions are those of a sophisticated international criminal businessman, not those of a middling or inexperienced novice. Jaber's culpability, and the centrality of his role, is reflected by the fact that he was the only defendant charged in all six counts of the Indictment. For, while Fayad was integral to the weapons deal (but was not involved in the narcotics trafficking), and El Merebi was integral to the narcotics trafficking (but was not involved in the weapons deal), Jaber had his hand in all three components of the criminal venture. In sum, a sentence of 180 months' imprisonment—the sentence called for by the Guidelines and recommended by the Probation Department—is warranted to reflect the seriousness of Jaber's involvement in large-scale weapons and narcotics trafficking to support a terrorist organization, to provide just punishment for that dangerous conduct, and to promote respect for the law prohibiting that conduct.

*Second*, the sentence of 180 months' imprisonment called for by the Guidelines is warranted to afford adequate specific and general deterrence. As discussed above, the defendant is a member of an expansive criminal network and demonstrated his ability to facilitate international weapons and narcotics trafficking on a large scale. Notwithstanding the defendant's claim that he is a reformed man capable of earning a lawful living, *see* Def. Mem. at 21, his conduct and history suggest that he may well seek to resume engaging in such activities in order to make money upon his release and deportation (nor does the fact that he is now in his early 60s mean that he would not or could not return to his illicit business activities).

Beyond the risk of recidivism posed by the defendant, the need to afford adequate general deterrence is a significant consideration in this case. The sentence imposed should send a clear message that providing support to terrorist organizations—in this case, through the independently dangerous and destructive activities of weapons trafficking and narcotics trafficking—will not be tolerated, and that criminals such as the defendant who engage in such conduct will face significant consequences when they are caught. The Government respectfully submits that the stipulated Guidelines sentence of 180 months' imprisonment would send the appropriate message consistent with the sentencing goal of adequately deterring serious criminal

conduct. The defendant's request for time-served, on the other hand, is utterly divorced from the reality of the seriousness of his conduct and the need to deter such conduct. *See* PSR at 25 ("A 15-year term of imprisonment is especially important to deter any similarly-minded individuals who are considering causing harm to the United States or to our interests.").

In his submission, the defendant advances a host of purported mitigating factors, none of which is compelling. ██████████████████████████████████████ The defendant did not waive extradition proceedings. *See* Def. Mem. at 4. His extradition was litigated in the Czech Republic over the course of nearly two years following his April 5, 2014 arrest, and he was not extradited until April 2016. When Jaber arrived in the United States, he pressed the case towards trial. More than a year after his initial appearance in U.S. court, and just three months before trial, he decided to plead guilty—pursuant to a plea offer that had been extended more than seven months earlier. In short, the defendant's acceptance of responsibility is fully and fairly reflected in the three-level reduction afforded to him under the Guidelines. *See* PSR ¶¶ 53-54. It does not warrant any further consideration in connection with sentencing.



Finally, much of the defense submission is devoted to cataloguing the defendant's various asserted physical and psychological ailments. The Government does not have cause to dispute the circumstances of the defendant's upbringing, or that he may have certain health and psychological issues. But these factors do not and cannot diminish the magnitude of his offense, particularly in light of his central and critical role in carrying out the scheme. In particular, the projection offered by the defense as to the defendant's possible life expectancy is inherently unreliable, and warrants little consideration when balanced against the indisputable fact of the seriousness of the defendant's conduct.

Nor do the defendant's asserted psychological issues mitigate the seriousness of his conduct. It is undisputed that the defendant knew exactly what he was doing when he worked, over an extended period and in concert with several criminal associates, to supply large-scale weapons and other resources to a terrorist organization in the business of killing Americans. Moreover, the recordings of Jaber's numerous meetings and calls with co-conspirators and the CSes—in various countries around the world and over the course of more than a year—show him to be a sophisticated, calculating, smooth-talking criminal operator, contrary to what he would have the Court believe based on his submission. The Government shares the view of the Probation Department that the defendant's professed psychological infirmities do not support

departing from the conclusion that a substantial sentence of incarceration is warranted based on the seriousness of the defendant's conduct and the need to deter such conduct. *See* PSR at 25 ("While the defendant may suffer from mental health issues, his conduct in the instant offense, which involved a potential threat to national security, is deserving of a lengthy term of punishment. We believe a sentence in the advisory guidelines range is appropriate and believe this sentence complies with the purposes set forth in 18 U.S.C. 3553.").

Ultimately, the defense submission amounts largely to a collection of distractions—distractions from the fact that the defendant was the central figure and driving force behind a large-scale international weapons and cocaine-trafficking conspiracy intended to benefit a terrorist organization. He deserves to be sentenced accordingly. The Government respectfully submits that the sentence of 180 months' imprisonment called for by the Guidelines is warranted and appropriate.

## Conclusion

For the reasons set forth above, the Government respectfully submits that the Court should sentence the defendant to a term of imprisonment of 180 months, the sentence called for by the Guidelines, as such a sentence is sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
George D. Turner
Assistant United States Attorney
(212) 637-2562

Cc: Defense Counsel (by ECF and email)