I21WjabS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   UNITED STATES OF AMERICA,
4             v.                          13 Cr. 485 (CM)
5
    FAOUZI JABER,
6   a/k/a "Excellence,"
7
                                          Sentence
8              Defendant.
9   ------------------------------x
10                                        New York, N.Y.
                                          February 1, 2018
11                                        4:00 p.m.
12
    Before:
13
                    HON. COLLEEN MCMAHON,
14
                                          District Judge
15
16                      APPEARANCES
17  GEOFFREY S. BERMAN
         Interim United States Attorney for
18       the Southern District of New York
    GEORGE D. TURNER
19       Assistant United States Attorney
20  ALEXEI M. SCHACHT
         Attorney for Defendant
21
22
23  Also Present:  Marwan Abdel-Rahman, Interpreter (Arabic)
24
25
```

I21WjabS

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. TURNER:  Good afternoon, your Honor.  George |
| 3 | Turner, for the government. |
| 4 | MR. SCHACHT:  Good afternoon.  Alexei Schacht, for the |
| 5 | defendant. |
| 6 | THE COURT:  Good afternoon. |
| 7 | And the interpreter, please. |
| 8 | THE INTERPRETER:  Marwan Abdel-Rahman. |
| 9 | THE COURT:  Good afternoon.  Can we resolve the |
| 10 | technical difficulty? |
| 11 | Mr. Schacht, when did you come into this case? |
| 12 | MR. SCHACHT:  I guess about two months ago. |
| 13 | THE COURT:  Counsel. |
| 14 | (At sidebar) |
| 15 | THE COURT:  Are you aware that Mr. Turner clerked for |
| 16 | me?  He was my law clerk once upon a time, a long time ago, |
| 17 | which was fully disclosed at the beginning of the case.  Ms. |
| 18 | Shroff said she had no issue with it and her client had no |
| 19 | issue with it.  I didn't know if you knew that, and I wanted to |
| 20 | be sure you did so that we're not going ahead if you'd think |
| 21 | that that was a problem. |
| 22 | MR. SCHACHT:  Thank you.  I was not aware of that, and |
| 23 | I have absolutely no problem of that. |
| 24 | THE COURT:  Fine.  I just wanted you to be aware. |
| 25 | MR. SCHACHT:  Excess of caution. |

I21WjabS

1          THE COURT:  Excess of caution.

2          MR. SCHACHT:  Thank you.

3          (In open court)

4          THE COURT:  This matter is on for sentencing under

5    docket No. S1 13 Cr. 485-01, United States of America v. Faouzi

6    Jaber, Mr. Jaber, having been found guilty by plea to one count

7    of conspiracy to provide material support or resources to a

8    foreign terrorist organization, a class C felony, in violation

9    of 18 U.S.C. Section 2339B(a)(1), (d)(1)(C), (d)(1)(D),

10   (d)(1)(E) and 3238.

11         This crime carries a statutory maximum penalty of 15

12   years' imprisonment; lifetime supervised release; a $250,000

13   fine, or twice the gross gain to the defendant or loss to

14   identifiable victims other than the defendant; and a $100

15   special assessment.

16         In connection with today's proceeding, I have received

17   and reviewed the presentence report prepared by United States

18   Probation Officer Specialist Ross Kapitansky.  I have reviewed

19   the government's sentencing memorandum, dated January 25, 2018,

20   and I have reviewed the sentencing memorandum that Mr. Schacht

21   has filed on behalf of Mr. Jaber.  It has attached to it

22   exhibits A, B, C, D, E, and that includes some letters on

23   behalf of the defendant and information about the defendant's

24   life expectancy and about how he got here, into this country,

25   in the first place and how some other people didn't get into

I21WjabS

1   this country.

2           I have reviewed all of those exhibits with care.

3           Is there anything else that I should have seen in

4   writing prior to today's proceedings?

5           From the government.

6           MR. TURNER:  No, your Honor.

7           THE COURT:  From the defendant.

8           MR. SCHACHT:  No, your Honor.

9           THE COURT:  Has the government reviewed the

10  presentence report?

11          MR. TURNER:  Yes, Judge.

12          THE COURT:  Are there any additions, deletions or

13  corrections?

14          MR. TURNER:  No, your Honor.

15          THE COURT:  Let me ask the same question of defense

16  counsel.  Counsel, have you reviewed the presentence report,

17  and have you gone over it with your client?

18          MR. SCHACHT:  Yes, your Honor.

19          THE COURT:  And did you do that with the assistance of

20  an interpreter?

21          MR. SCHACHT:  Yes.

22          THE COURT:  Are there any additions, deletions or

23  corrections you think should be made to that document?

24          MR. SCHACHT:  No, your Honor.

25          THE COURT:  OK.  Have a seat.

I21WjabS

<table>
<tr><td>1</td><td>Here's what occurs to me as I'm sitting here with</td></tr>
</table>

1          Here's what occurs to me as I'm sitting here with

2     these two documents.  First of all, we're up against a

3     statutory maximum of 15 years, which is well, well below the

4     sentencing guidelines range, but I have two wildly divergent

5     stories here, and I mean wildly divergent stories, about

6     Mr. Jaber.  I wonder if there's enough congruence between these

7     two stories to allow me to go ahead with sentencing today, or

8     are they so incongruent that there's a need for a <u>Fatico</u>

9     hearing.  I would like to hear what people think about that.

10          Mr. Turner.

11          MR. TURNER:  Your Honor, the offense conduct that is

12     set forth in the PSR is undisputed, and while the parties'

13     submissions do put different --

14          THE INTERPRETER:  Your Honor, if Mr. Turner kindly

15     speaks into the microphone so interpreter can hear him, because

16     I'm not using any equipment.

17          THE COURT:  Thank you.

18          MR. TURNER:  Your Honor, I'll start again.

19          The offense conduct that is set forth in the PSR is

20     undisputed, and while the parties' submissions make arguments

21     and take different views as to the defendant's culpability, we

22     do not believe that there are factual disputes that warrant or

23     necessitate a hearing.

24          THE COURT:  And from the defendant.

25          MR. SCHACHT:  Your Honor, it is true that there's not

I21WjabS

1    really a dispute about some of the basic facts in the case, but

2    the case is reduced in the probation report to really two or

3    three pages of offense conduct.  I've reviewed or I have had

4    the chance to review hundreds out of the thousands of pages of

5    discovery, and so if you took a more wide-ranging view, I think

6    we do have a dispute about what the facts are.

7              THE COURT:  In that case, we need to schedule a <u>Fatico</u>

8    hearing.  This is not something that I say lightly.  This is

9    not something that I enjoy doing, and I'm a pretty busy person.

10             First of all, the defendant's role in the offense has

11   something to do with how I sentence him; and second, it just

12   looks to me like we were talking about two entirely different

13   situations here.  It's very strange reading these two documents

14   side by side, which I did as recently as two days ago.

15             MR. SCHACHT:  Judge, in preparation for today, I was

16   looking through some of the transcripts of the conversations

17   with the informants and my client, and I think what happens,

18   probably, is the government takes the fact that the defendant

19   was present, obviously, and participated in this and is guilty,

20   and he admits he's guilty, and then they focus simply on the

21   fact that he was present when these conversations occurred

22   about the sale of missiles and so on.  But really, if you scope

23   out and look at all of the conversation, my client was the

24   person who introduced the people.  My client doesn't have

25   access to missiles himself personally, otherwise he wouldn't

I21WjabS

have brought in anyone.  My client doesn't have access to

drugs, otherwise, he would have just kept 100 percent of the

profit and done it all himself.

THE COURT:  That's kind of irrelevant, is it not?  He

knew somebody who could get drugs.

MR. SCHACHT:  Yes.

THE COURT:  He knew somebody who could get missiles.

The government has represented Mr. Jaber to be a drugs and arms

dealer.  That doesn't mean he's growing the drugs and that

doesn't mean he's processing the drugs.  Most of the big-time

drug dealers that I've put away don't do either of those

things.  They acquire them from other people, which makes them

coconspirators.

MR. SCHACHT:  Yes, and I'm looking at one of the

DEA-6s that I happened to bring with me today.  The person who

introduced my client to the informant is a man named Makki, and

this is in a DEA-6:  "Mr. Makki explained to the informant that

he did not think Mr. Jaber could even get cocaine."  Obviously

I'm not saying he's not guilty of the crime.

THE COURT:  So what?

MR. SCHACHT:  I'm saying he's not the criminal

mastermind, our position is, that the government's presentation

sort of implies.

THE COURT:  It doesn't imply.

MR. SCHACHT:  Or states.

I21WjabS

1          THE COURT:  He states it flat out.

2          MR. SCHACHT:  Yes.

3          THE COURT:  One thing I can say about Mr. Turner is I

4    know that he writes well and clearly.

5          MR. SCHACHT:  And I think we have a dispute about

6    that.

7          MR. TURNER:  Judge, the facts that have been outlined

8    by defense counsel just now are not in dispute.  The defendant

9    was the facilitator of this transaction.  He introduced both El

10   Merebi and Fayad.  Fayad was going to supply the weapon.  El

11   Merebi was the cocaine trafficker.  None of those facts are in

12   dispute.

13         THE COURT:  I personally wouldn't know someone who

14   could supply either cocaine or weapons to anybody.  I don't

15   know how to do that.  I don't know if you know how to do that.

16   I don't know if Mr. Turner knows how to do that.  I don't know

17   if Ms. Shroff ever knows how to do that.  We don't know how to

18   do that.  OK?

19         Mr. O'Neil doesn't know how to do that.  The court

20   reporter doesn't know how to do that, but your client knows how

21   to do that, right, because he did that?

22         MR. SCHACHT:  Yes.  Yes, my client was a high-ranking

23   government official in a country where he knew people who were

24   in the arms business, and he knew that.  I suspect you would

25   find people in many countries who are high-ranking government

I21WjabS

1    officials, assistants to the president of the country who know

2    about how to get weapons.

3          My client was himself a drug addict, and he certainly

4    knew many people who could supply drugs.

5          THE COURT:  OK.

6          Yes, Mr. Turner.

7          MR. TURNER:  I was going to add, your Honor, that

8    these are the sorts of mitigating arguments that are made at

9    sentencing, but there is no dispute here as to the underlying

10   facts of what happened during this transaction.

11         THE COURT:  OK.  I think in the end that Mr. Turner is

12   probably correct here, just based on the statements made by

13   defense counsel, and he's made a very powerful presentation

14   here, as has Mr. Schacht.  But just based on the statements

15   that are made today, if all I do for purposes of sentencing is

16   find that his client, a high-ranking official in a foreign

17   country, who knew where weapons and drugs could be bought,

18   facilitated transactions involving those weapons and drugs,

19   transactions that he believed were going to go down with a

20   terrorist organization in Colombia, and I make no other

21   findings, I need to make no other findings, and what we're

22   talking about is nuance.

23         Is that a fair statement?

24         Mr. Turner.

25         MR. TURNER:  We agree with that statement, with the

I21WjabS

1    addition that there is some additional information set forth in

2    the PSR, which we understand to be undisputed, documenting the

3    existence of the meetings, the participants and the general

4    nature of the discussions that took place.

5         THE COURT:  OK.  But even so, the basic, bare bones

6    fact that a high-ranking official in a foreign government knows

7    where to get arms and facilitates a transaction to supply arms

8    to a terrorist organization, that's enough to get me to a

9    15-year sentence, which is what you want, right?

10        MR. TURNER:  Yes, Judge.  We believe that is an

11   accurate summary, at a high level, of what transpired and that

12   it supports the sentence the government is seeking, a

13   guidelines sentence.

14        THE COURT:  Do I have to get any more specific?  I

15   don't think so.

16        MR. TURNER:  Judge, we believe that the conduct you

17   just described, facilitating a transaction to supply weapons

18   and drug-trafficking services to a terrorist organization,

19   fully supports a guidelines sentence.

20        THE COURT:  OK.  Mr. Turner, do you want to be heard

21   on sentence?

22        MR. TURNER:  Judge, very briefly.

23        we have set forth in our submission that a guidelines

24   sentence here of 180 months' imprisonment is warranted to

25   reflect the seriousness of the defendant's conduct and to deter

I21WjabS

1    both the defendant and other international traffickers from

2    engaging in similar conduct.  The defendant's conduct was

3    extremely serious.  He coordinated and facilitated an

4    international transaction involving the supply of weapons,

5    drugs and money-laundering services to a terrorist

6    organization.  He did so knowingly, and that conduct is of the

7    utmost seriousness.

8            The guidelines sentence is also warranted to deter

9    both the defendant as well as other international traffickers,

10   driven by profit, as the defendant was here, who are willing to

11   engage in not only this independently dangerous conduct but to

12   do so to benefit a dangerous terrorist organization, Judge.

13           THE COURT:  Counsel, let's look at page 2 of the

14   government's letter of January 25, 2018.  It says at the bottom

15   of the first full paragraph that in a recorded call, Mr. Jaber

16   indicated that he was capable of facilitating the business that

17   was discussed, which was weapons, cocaine and money laundering,

18   and cautioned the individuals on the phone to be careful when

19   communicating by phone or email.

20           Does the defendant dispute that that is an accurate

21   rendition of a statement made by your client during a recorded

22   phone call?

23           MR. SCHACHT:  No, we don't contest that.

24           THE COURT:  OK.  Let's go to the next paragraph, which

25   talks about a meeting a few weeks later.  It says during that

I21WjabS

1    meeting, which was recorded, your client, Mr. Jaber, conveyed

2    that he was capable of facilitating, one, the supply of weapons

3    to the FARC for use against American and Colombian forces in

4    Colombia; two, storing, protecting and transporting cargo and

5    cocaine in Africa; and three, laundering cocaine-trafficking

6    proceeds for the FARC.

7         Does your client dispute the statements allegedly made

8    by or attributed to him in that recorded phone conversation?

9         MR. SCHACHT:  I dispute it only inasmuch as I don't

10   think my client ever used the word "FARC" himself.  My client

11   did not know what FARC was.  The people who were targeted --

12        THE COURT:  Is there a transcript of this phone

13   conversation?

14        MR. SCHACHT:  There is somewhere, I'm sure.

15        THE COURT:  You don't?  OK.

16        MR. TURNER:  Judge, what's relayed here is not that

17   the defendant necessarily used the word "FARC" but that he

18   conveyed that he was capable of facilitating the transactions

19   that are described.

20        THE COURT:  One of which was supplying weapons to

21   FARC, right?

22        MR. TURNER:  Correct.

23        THE COURT:  OK.  Does the defendant dispute that?

24        MR. SCHACHT:  No.  All I was saying, your Honor, is

25   the way it's written there, it makes it look like my client

I21WjabS

1    said something about FARC; he didn't.  He said he's capable of

2    facilitating these transactions.  He just didn't say for FARC.

3    That's all I was disputing.

4              THE COURT:  OK.  The next paragraph describes meetings

5    that took place in November of 2012, during those meetings,

6    which were recorded, after being informed that a portion of the

7    FARC's cocaine was transported to New York, Jaber advised that

8    he was capable of moving money for the FARC from overseas

9    locations to New York, and with respect to the weapons

10   component of the potential deal, Jaber explained he would

11   contact his weapons suppliers once CS-2 sent Jaber a list of

12   the particular weapons he needed, and he asked CS-2 to specify

13   the locations where the weapons would be delivered.

14             Does your client dispute that he said substantially

15   those things in a recorded telephone conversation or at a

16   recorded meeting?

17             (Counsel conferred with defendant)

18             MR. SCHACHT:  Yes, your Honor.  I'm sorry.  I just

19   needed to consult with my client for a moment.

20             THE COURT:  Of course.

21             MR. SCHACHT:  My client's recollection of the phone

22   call was that he had said that he would introduce another

23   person, Jean-Pierre Moreau, who could help do these things.

24             THE COURT:  You know what I'm going to do?  I want the

25   transcripts.

I21WjabS

1          MR. SCHACHT:  My client pled guilty, Judge.

2          THE COURT:  I want the transcripts.  I think that's

3    fair.

4          Is that fair, Mr. Turner?  I think it's fair.  I'd

5    like these transcripts -- the translations, obviously -- of

6    these recorded conversations.  I'd like to see them.

7          MR. TURNER:  Judge, we can work to obtain transcripts

8    of calls or meetings that your Honor wishes to review.

9          THE COURT:  Apparently defense counsel has reviewed

10   them, so why can't I review them?

11         MR. TURNER:  We can certainly --

12         THE COURT:  He doesn't speak Arabic, or I don't know,

13   maybe he does.

14         MR. SCHACHT:  I don't speak Arabic, your Honor.

15         MR. TURNER:  Judge, we can submit transcripts that

16   have been provided to the defense to the Court, if the Court

17   wishes.

18         Again, we are highlighting that these facts have been

19   set forth in the PSR.  We don't understand there to be a

20   dispute as to the substance of the conversations.

21         THE COURT:  I understand there to be a dispute,

22   Mr. Turner.  I understand the defendant to be disputing it, and

23   I'd like to read the transcripts myself, because you clearly

24   say things that would cause me to give this man a guidelines

25   sentence.  OK?  And I have a letter here from a reputable

I21WjabS

1    lawyer who says he has reviewed these things, and it comes

2    across totally differently.  I just think it would be useful

3    for me to see the transcripts.

4             MR. SCHACHT:  Your Honor, I appreciate that, but I

5    don't intend for anything I say whatsoever to be a withdrawal

6    of my client's acceptance of responsibility.  He committed this

7    crime.

8             THE COURT:  Yes, I understand that, and you want me to

9    sentence him to time served, and Mr. Turner wants me to

10   sentence him to 15 years, and the reason you want me to

11   sentence him to time served is you say, Oh, you know, he was

12   like a, kind of a, not an innocent bystander, but not much of a

13   participant.  And this letter from the government portrays him

14   as quite a driving force in this matter.

15            MR. SCHACHT:  Well, no.

16            THE COURT:  And I want to know, since there are

17   recordings of the conversations, if there really is a dispute

18   about whether he was just somebody who made an introduction

19   versus somebody who really said, I can do this, I can do that,

20   I can do the other, I can fix you up with this, I can do that.

21   I'd like to know.  I'd like to be sure in my own mind before I

22   send your client away for 15 years that what Mr. Turner says in

23   his letter is true.

24            MR. SCHACHT:  I appreciate that, your Honor, but my

25   client clearly was the point person who was contacted by the

I21WjabS

1    informant.  He was integral.  But for my client introducing

2    these other men, the crime could never have occurred, so he was

3    essential.

4              THE COURT:  Without your client.

5              MR. SCHACHT:  He was essential.

6              THE COURT:  He's essential.

7              MR. SCHACHT:  He was essential to it happening, but he

8    was not himself an arms dealer or drug trafficker.

9              THE COURT:  Oh, obviously.  He was not himself the

10   person who supplied the arms.

11             MR. SCHACHT:  Yes.

12             THE COURT:  And he was not himself the person who

13   processed the drugs.

14             MR. SCHACHT:  Well, not just not processed the drugs,

15   because of course, the man he introduced him to didn't process

16   them either, but he was not the person who had the direct

17   access either.  He didn't have drug suppliers.  He didn't have

18   weapons suppliers.  He just knew people who get those things.

19   Obviously that's a serious crime.  I'm just trying to

20   distinguish it between him being the key person who is a

21   professional weapons trafficker.  That's all.

22             THE COURT:  Oh, OK.  So you really don't deny that he

23   did all the things that are set out in Mr. Turner's letter; you

24   just think that that makes him not a weapons dealer.

25             MR. SCHACHT:  You asked me specific questions about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I21WjabS

1   his letter, and all I contested about his letter is that

2   Mr. Turner repeatedly uses the word "FARC," and in the

3   conversations, the actual conversations, the word "FARC" in

4   those conversations is not repeatedly used.  And he didn't put

5   it in quotes.  I'm not saying he did something wrong.  He was

6   repeating.

7           THE COURT:  No.  It's a paraphrase.  It's a

8   paraphrase.

9           MR. SCHACHT:  That's all.

10          THE COURT:  It's clear from the context of the

11  conversations that they were talking about FARC, one hopes.

12  Your client did plead guilty to providing material support to a

13  terrorist organization.

14          MR. SCHACHT:  At the beginning of the original sort of

15  introduction of the participants.

16          THE COURT:  You're not suggesting that your client

17  didn't think this was all about FARC, are you?

18          MR. SCHACHT:  Absolutely not.

19          THE COURT:  OK.

20          MR. SCHACHT:  At the beginning, there was one

21  conversation about FARC, and then there's many subsequent

22  conversations where no one's mentioning FARC anymore.

23          THE COURT:  But we're talking about the same deal that

24  we were talking about at the beginning, and at the beginning,

25  it was clear that it was FARC, right?

I21WjabS

1          MR. SCHACHT:  Yes.

2          THE COURT:  And your client knew that, right?

3          MR. SCHACHT:  Yes, and I think I say that in my

4    presentation.

5          THE COURT:  OK.  Fine.

6          Sir, I'll hear you on sentencing.

7          MR. SCHACHT:  I'd like to talk just briefly about how

8    this came about.

9          My client had a prior relationship for many years with

10   the person I call Joseph in my memorandum.  The details of

11   their history is not really relevant too much one way or the

12   other toward sentence, only inasmuch as it gets to the issue of

13   why is my client approached.  I know, because he's told me, my

14   client's told me, but I also know from the discovery, that my

15   client was told -- I'm sorry.  The informant was told that my

16   client had money problems and owed a lot of money at the time

17   when this began, in 2012.

18         It was also clear to the informant, because they knew

19   each other, that my client had a drug and alcohol problem.  In

20   fact, at the very first meeting, the informant -- and I'm not

21   just taking my client's word for this; I have this in the

22   paginated discovery, page 98 of the discovery -- the first

23   thing that the informant gives to my client is, he buys him

24   whiskey, a couple bottles of whiskey.  There's nothing

25   necessarily wrong or illegal about that, but my client is

I21WjabS

1    targeted.  He's in a weakened position.

2         You know from my paperwork, and Ms. Shroff did a

3    wonderful job of getting a doctor's report, which is exhibit A

4    to my memorandum, and I think that goes into great detail to

5    explain the psychological state that my client was in at the

6    time that these crimes occurred.

7         I don't think any of that rises to the level of a

8    legal defense.  Intoxication generally is not a defense under

9    our system.  Mental illness is not a defense unless it rises to

10   a certain level that's extremely hard to reach.  My client was,

11   though, and I think this is also undisputed also, suffering

12   from personal drug abuse, suffering from severe mental health

13   issues, suffering from alcohol abuse, and all of this was

14   happening and was essentially untreated in this key 2012-2013

15   period.

16        Part of the reason why this conspiracy lasts so long,

17   and you'll see it's a multiyear charge; it's a multiyear

18   conspiracy.  It's, of course, a DEA setup, so no weapons are

19   ever delivered.  The reason this takes so long is because in

20   the beginning, my client is resistant to the informant because

21   they have a prior bad relationship, and so my client's

22   suspicious, Why is this guy talking to me even?  And my client

23   is essentially worn down.  And this is not a defense, and I'm

24   not saying he's innocent.

25        The informant essentially tells my client, You can

I21WjabS

1    make millions of dollars.

2            THE COURT:  Because your client's never done anything

3    like this before.

4            MR. SCHACHT:  My client --

5            THE COURT:  Never done anything like this before.

6            MR. SCHACHT:  My client has never --

7            THE COURT:  Your client's never done anything.

8            MR. SCHACHT:  He's never tried to supply an

9    international terrorist organization with drugs or weapons.

10   That's true.  And I'm not remotely suggesting it's an

11   entrapment situation.  I'm saying that my client, in his mental

12   state that's discussed in exhibit A, when called up by an

13   informant and pushed over basically a 12-month period, offered

14   what amounts to millions of dollars in profits that are held

15   out to him, agreed to do this.  He agreed to introduce the

16   people.

17           That doesn't make him innocent.  I think it takes the

18   case, under the 3553(a) factors, out of a situation where

19   someone should be punished as other people in similar cases

20   are.  I cited two cases in my memorandum of people in this

21   district, one of whom lost a jury trial with similar charges of

22   supplying missiles to FARC or to terrorist organizations, both

23   of whom received only ten-year sentences, and that's in this

24   district.  And those were younger, from what I gather, younger,

25   healthier people.  Certainly they were younger, which gets to

I21WjabS

1    another issue, the issue of my client's health, and you

2    mentioned the life expectancy report that was prepared by prior

3    counsel.

4            This report also -- of course, who knows how long

5    someone's going to live?  He could live one year or he could

6    live 30 years.

7            THE COURT:  True.

8            MR. SCHACHT:  Nobody knows.

9            But someone in his situation, according to this

10   report, which was made a year ago, has a life expectancy of

11   about 7.9 years.  Now it's about maybe 6.9 years, so a sentence

12   of 15 years based on the actuarial chart and table would

13   essentially be a life sentence.

14           THE COURT:  So is a sentence of ten years, so is a

15   sentence of eight years, based on the actuarial tables.

16           MR. SCHACHT:  A sentence of eight years wouldn't be,

17   because he's got time served.

18           THE COURT:  He's got a couple of years under his belt.

19           MR. SCHACHT:  He's got time in prison already.

20           THE COURT:  But ten years would be.

21           MR. SCHACHT:  I think when you combine these factors,

22   how did he get into the case, I think that's a mitigating

23   factor.  I know your Honor's personally experienced.

24           THE COURT:  I just don't see why it's a mitigating

25   factor how he got into the case.

I21WjabS

1          MR. SCHACHT:  I think it's a mitigating factor.  I

2    know you've seen other cases as a judge.  It's a mitigating

3    factor because the government approaches somebody who is not an

4    ideological terrorist or not a terrorist of any sort.  They

5    literally offer --

6          THE COURT:  No, he's somebody who is willing to supply

7    arms to a terrorist.  That's just as bad.

8          MR. SCHACHT:  But they're not doing that.

9          THE COURT:  He is doing it.

10         MR. SCHACHT:  He's at home.

11         THE COURT:  He's facilitating it.

12         MR. SCHACHT:  He's at home, using drugs, owing money,

13   and they call up and they go, How would you like a few million

14   dollars?

15         THE COURT:  I am particularly and acutely sensitive to

16   this issue in appropriate cases.  I am, because I had the case

17   of cases.  I had the Newburgh Four case.  I had the ultimate

18   entrapment case that turned out not to be entrapment, according

19   to the jury and the Second Circuit.  I'm kind of sensitive to

20   this issue, but I'm trying to fit your argument into, I guess,

21   my sensitivity, because I don't see that it makes any

22   difference that he was somebody who was doing drugs at the

23   time.  He was approached presumably, at least I get this

24   suggestion from the government, he was approached not without

25   reason.

I21WjabS

1          The principal defendant in the Newburgh Four case was

2     approached like off the street, a wild guess.  But your guy --

3          Am I correct, Mr. Turner, he was a target of an

4     investigation, a sting operation?  He was the target?

5          MR. TURNER:  That's correct, your Honor.

6          THE COURT:  Right.

7          He was known to the authorities before he was

8     approached, and I think that's very different than the kind of

9     case where someone's trolling around the city of Newburgh,

10    going to the mosque, the black Muslim mosque, and asking

11    questions about terrorism.  It's just a very different

12    scenario.

13         MR. SCHACHT:  I agree with you that he was targeted.

14         THE COURT:  OK.

15         MR. SCHACHT:  There's no dispute there.

16         THE COURT:  He wasn't targeted for no reason.  The

17    government had some reason to think it would be worth investing

18    some time and effort and resources in looking into your

19    client's business dealings.

20         MR. SCHACHT:  And I think I outlined the reasons in my

21    memorandum.  The reason he's targeted is because the informant

22    with whom he has a prior multiyear relationship, Joseph -- they

23    hate each other, have made trouble for each other over the

24    years.

25         THE COURT:  Oh, Joseph has lied to the government.

I21WjabS

1    Your position is that Joseph lied to the government.  Your

2    client's never done anything, no reason for the government to

3    be interested in him, but Joseph went and lied to the

4    government.

5         Your client's nodding, so I know he hears what I'm

6    saying.  Joseph went to the government and told a big fat lie.

7         MR. SCHACHT:  I'm not saying that everything that

8    Joseph said is a big fat lie, and I'm not saying this has

9    anything to do even with what my client told me.

10        Joseph, and I'm looking at pages 2107 and 2109 of the

11   discovery, which are DEA-6s, and you can see in these 6s that

12   Joseph doesn't really even know so much about him.  Joseph

13   calls up this other person named Makki, who I've mentioned, who

14   is not mentioned in the probation report, who's not indicted,

15   and Makki is telling Joseph that he, Makki, thinks that my

16   client cannot get drugs but maybe can get weapons, and he, my

17   client, has a lot of financial problems and owes a lot of

18   money.

19        I'm not saying Joseph's lying.  I'm saying Joseph gets

20   this hearsay information from some person, who is not mentioned

21   in the probation report, not indicted, and then based on that

22   information from Mr. Makki to Joseph, the government targets

23   him.  I'm not saying anybody's even necessarily doing anything

24   wrong.  I'm just saying that it's not so far off of going

25   around to the black Muslim mosque in Riverdale and trolling for

I21WjabS

1    people who, if you offer them enough money, may do something.

2         So they find my client.  They offer him millions of

3    dollars, and he says yes.  I'm not saying he deserves a prize

4    for that, that he's a great guy.  I'm saying that these types

5    of cases where they're supposedly looking for terrorists or

6    terrorism, and they offer people -- the DEA -- a lot of money,

7    and you made the point quite well, your Honor, before, when you

8    said Mr. Turner, myself, you, would we know where to get

9    missiles, probably not.  My client knew where to get missiles,

10   and the three of us wouldn't know, so it's, of course, a factor

11   on the government's side, but the reality is he was a

12   government official and he knew where to get these things.

13        THE COURT:  I'm a government official.

14        MR. SCHACHT:  Well, you're in the judiciary.  If you

15   were in the executive branch, you might know where to get

16   missiles, depending on what part of the executive branch.

17        THE COURT:  You're in the executive branch.  Do you

18   know where to get missiles, Mr. Turner?

19        MR. TURNER:  No, your Honor.

20        MR. SCHACHT:  I think when you look at what is

21   undisputed, his poor health, his life expectancy, which of

22   course, we agree we can't be sure what it is --

23        THE COURT:  Right.

24        MR. SCHACHT:  -- the horrendous experience he's had in

25   jail, and of course, he deserves to be in jail, because he

26

I21WjabS

1   needs to be punished, but he's suffered above and beyond, and I

2   talk about that in my memorandum.  And I think when you look at

3   the whole picture of the case, not just pulling out one

4   argument, because I agree with you, he doesn't deserve a

5   sentence of time served that he's done or even of seven years

6   based on any one argument.  But when you look at it

7   collectively, how he was brought into this crime, what his

8   mental state was at that time, he's now been in jail for quite

9   a while.  He's clean.  He's not abusing any substances.

10  Luckily, at the MDC they're giving him very good mental health

11  treatment and psychiatric care, and all of those things

12  together justify a substantially reduced, nonguidelines

13  sentence so that he has the hope of getting out of jail and

14  seeing his family again before he dies.

15          That's my argument, and thank you very much for

16  listening.

17          THE COURT:  Thank you, sir.  I really appreciate the

18  careful presentation that you made.

19          Mr. Turner, does the government have anything else it

20  wishes to add in response?

21          MR. TURNER:  No, your Honor.

22          THE COURT:  Mr. Jaber, is there anything that you want

23  to say to me before I sentence you?

24          THE DEFENDANT:  Of course, your Honor.

25          THE COURT:  Yes, sir.

I21WjabS

1        THE DEFENDANT:  Good evening, your Honor.

2        THE COURT:  Sir.

3        THE DEFENDANT:  Your Honor, if you are kind enough to

4   allow me ten minutes to explain the whole situation to you?

5        THE COURT:  I would urge you to turn to your attorney.

6        Sir, obviously you need to speak to your client.

7        I'll listen to anything you have to say.

8        THE DEFENDANT:  Your Honor, Joseph kept on calling me

9   for a whole year, and I kept on telling him, What is it that

10  you want from me?  That's all in the discovery, all those

11  different conversations.  He said that there was a business

12  deal with a Greek man.  I told him, What kind of business is

13  that?

14        (Counsel conferred with defendant)

15        THE DEFENDANT:  He was vague with me, and he entrapped

16  me into this drug thing.

17        (Counsel conferred with defendant)

18        THE DEFENDANT:  Your Honor, all I'm asking from you is

19  mercy.  I admit that I committed a crime, but I didn't do it

20  thoughtfully.  It wasn't like I was eager to commit that crime.

21  I was under the influence of drugs.

22        (Counsel conferred with defendant)

23        THE DEFENDANT:  I'm asking forgiveness from you and

24  from the American nation and from the U.S. government.  I do

25  love the American people, and I had a good history of

I21WjabS

```
 1    interaction with the U.S. embassy and the Ivory Coast.  We

 2    cooperated against terrorism.

 3              And your Honor, I could have remained in Beirut,

 4    Lebanon.  I would have been out of reach, but I chose to come

 5    here.  I refused to stay in Prague, the Czech Republic, and I

 6    asked that I be transferred, extradited to the United States.

 7    I did not fight the extradition process.

 8              (Counsel conferred with defendant)

 9              THE COURT:  That wasn't quite how I understood the

10    facts.

11              THE DEFENDANT:  There was an operation in which six --

12    five Czech citizens were abducted in Lebanon, and I tried my

13    best to abort that operation.  And when it was finally done,

14    they wanted to exchange me for one of their Czech citizens, but

15    I refused.  I said no, I wanted to go to America, not Lebanon,

16    and I resisted the abduction operation.  I personally resisted

17    it.  And I gave them information, to the government over there.

18    I sent four letters to the U.S. ambassador in Prague, and if

19    these two other defendants, the two codefendants, were brought

20    to the United States, I am sure that the U.S. Attorney's Office

21    would have used me as a witness to testify against them.

22              (Counsel conferred with defendant)

23              THE DEFENDANT:  And your Honor, you know about my

24    health.

25              THE COURT:  I do.
```

I21WjabS

1    THE DEFENDANT:  I have prostate cancer now and I have

2    developed new ailments.

3    So your Honor, finally, I plead with you for mercy.  I

4    want to see my very old mother.  She's 82 and she's dying, and

5    I have an 11-year-old daughter who may end up on the street.  I

6    was responsible for supporting my entire family; now they will

7    end up homeless.  My older daughter has two children whom I

8    never saw.  One is two years old and one is one year old, the

9    one who sent you one of the letters.

10    So I am begging you for mercy and to let me go.  This

11    was a once-in-a-lifetime mistake but will never be repeated.

12    I'm a man of peace.  I helped achieve peace in my country.  I

13    had a charity foundation, which helped the poor.

14    (Counsel conferred with defendant)

15    THE DEFENDANT:  And the needy.  This was my previous

16    life, and nothing -- I will never do anything wrong again.

17    Thank you very much for allowing me this time to

18    speak, your Honor.

19    THE COURT:  Have a seat.

20    Is there anything the government wishes to say?

21    MR. TURNER:  No, your Honor.

22    THE COURT:  Thank you.

23    Defense counsel.

24    MR. SCHACHT:  No.  Thank you very much.

25    THE COURT:  All right.  I confess that I was troubled.

I21WjabS

1          Well, the first thing I should say is that it is my

2     practice in these cases to read the defense submission first.

3     Usually that works well, because the government tends to be

4     very late with its submission, but it is my practice in these

5     cases to read the defense submission first.  And I confess that

6     my antenna went up when I read Mr. Schacht's submission,

7     because I have this great sensitivity to this issue of sting

8     operations.

9          So I read Mr. Schacht's submission with great care,

10     and it didn't quite cohere for me, but I allowed, as how in

11     other cases, we had trials, we had hearings, I heard some

12     evidence, I knew perhaps somewhat more about the defendant or

13     about the case than I did in this particular instance where

14     what I had was the plea minutes and the PSR, but even though

15     the story didn't quite cohere, why would the government be

16     starting an investigation into this guy -- starting an

17     investigation into this guy, not running around looking for a

18     guy and then starting an investigation.

19          That's the colossal difference between this case and

20     the Newburgh Four case.  In fact, in the Newburgh case, the

21     government went around looking for a person to investigate, and

22     in this case, the government came prepared to investigate

23     Mr. Jaber, so that things didn't quite cohere for me.  But it

24     was with a healthy degree of skepticism that I picked up the

25     government's submission to read second.

I21WjabS

1          The government's submission is tremendously

2     convincing, in significant part, because the government

3     represents, and I have no reason to disbelieve the

4     representation, that in recorded conversations, this defendant,

5     Mr. Jaber, the person whose conduct the government set out to

6     investigate, via the tactic of a sting operation, but the

7     intended target or one of the intended targets of the

8     investigation, from the get-go, represented that he could

9     facilitate very serious criminal conduct, weapons dealing.

10          There are a lot of people in the executive branch of

11    the United States government who know that you can buy weapons

12    at Lockheed Martin, you can buy weapons at Boeing, you can buy

13    weapons at Colt.  You can buy weapons at a number of companies

14    legitimately, but they don't know international arms dealers.

15    Mr. Jaber, it seems, knows international arms dealers.  Whether

16    by virtue of his being a government official on the Ivory Coast

17    or otherwise doesn't matter.  He knew enough to know that there

18    were people who did illicit arms transactions that he could put

19    these folks in touch with.

20          MR. SCHACHT:  Yes, your Honor.  It's just it's not

21    from the get-go, though.

22          THE COURT:  My turn to talk.

23          Am I wrong that Mr. Jaber facilitated the arms

24    transaction by being the one to bring in the people who were

25    going to supply the arms?

I21WjabS

1        MR. SCHACHT:  You're correct, but it's not from the
2   get-go.
3        THE COURT:  It doesn't matter.
4        MR. SCHACHT:  It's after almost a year of importuning
5   and pressuring.  That's all.
6        THE COURT:  It doesn't make any difference.  He
7   happens to know something that most of us do not know in this
8   world, and that is where to get illicit arms.
9        MR. SCHACHT:  I think that's true, but I think the
10  assistant to the president in any of the countries, neighboring
11  countries of Ivory Coast or anywhere from that part of the
12  world, in West Africa, they do know where.
13       THE COURT:  Well, I don't know that.  I don't know
14  that to be true.  But I know that it's not a good thing if you
15  know where you can get illicit arms and then you meet someone
16  who says he wants illicit arms -- I don't care how you meet
17  him -- and you say:  I can bring you guys together; I can help
18  you do this deal.  Because the flow of arms, illegitimately,
19  illicitly, across borders, to terrorists is a big part of why
20  the world is in the mess that it's in today.
21       The underground arms trade is one of the most
22  horrifying things that is going on in this world.  The notion
23  that people would solve their money problems by selling things
24  that kill to people who want to kill is terrifying.  It's
25  disgusting and should be punished to the fullest extent of the

I21WjabS

1    law.

2            Then you add on drugs and you add on the money

3    laundering.  Mr. Jaber is a very talented man at very bad

4    things.  And however he got the information, the government

5    appears to have had some reason to suspect that that was true

6    before they started looking into Mr. Jaber's conduct, so that

7    differentiates him from my entrapment defendant, Mr. Cromley.

8            As it turns out, Mr. Jaber could do everything he said

9    he could do.  The fact that nothing bad happened, because this

10   was a sting operation, this was part of a government

11   investigation, is really of no legal moment.  This man was

12   fully willing to make sure that killers could buy the

13   implements of killing; happy to do it.  As long as it solves

14   his money problem, helps keep him in drug, that was fine.  I

15   really don't see any mitigating factors here.

16           Now, I've been very inquisitive during the course of

17   this sentencing, more so than at most sentences, because I

18   wanted to be really sure in my own mind that I was not dealing

19   with a Newburgh-type situation.  I'm not.  Not here, not this.

20           This crime is fully deserving of the maximum

21   punishment the law allows.  In this particular case, the

22   defendant is lucky the statute mitigates.  The guidelines

23   sentence is, what, in the high 200s, low 300 months?

24           MR. TURNER:  360 to life, your Honor.

25           THE COURT:  360 to life, your Honor.  OK.

I21WjabS

1          The statute prevents me from imposing that sentence.

2     The statute limits it to 15 years.  While I hear you about

3     Mr. Jaber's life expectancy, the fact that he was an older

4     gentleman when he committed these crimes and when he admitted

5     to these crimes and when he took his guilty plea and became

6     incarcerated and all that, I don't have the power to say,

7     You'll never get out of jail, and he very well might someday.

8     And if he doesn't, well, he made his own bed.

9          I appreciate that information was given to me that's

10    at exhibit C of the defense submission consisting of a letter

11    from Warden Tatum.  I have looked at that letter.  I've thought

12    about that letter.  It is a wonderful thing that Mr. Jaber has

13    been helpful in the detecting of contraband, but I tend to

14    agree with the government.  That's small potatoes against what

15    he tried to do, to line his own pockets, to support his own

16    habits, without regard to who else might be hurt, who else

17    might be killed, who else might be dragged down.

18         The fact that his codefendants, who richly deserve to

19    be here, are not here is no concern of mine and is not

20    relevant, in my view, to the determination of what sentence

21    should be imposed on Mr. Jaber for Mr. Jaber's conduct.  There

22    are no what-ifs here.

23         I am sorry, sir, that you have not seen your

24    grandchildren.  I am sorry, sir, that your family must find

25    some other means to support itself.  I am sorrier than you know

I21WjabS

1    that you may never again see your mother.  But what you did was

2    an extraordinarily reprehensible thing, and if I had the power,

3    I would actually punish you rather more severely than the law

4    allows me to, but there is a statutory maximum sentence here of

5    15 years, and 15 years, given everything that's set forth in

6    the government's letter, to which the defendant has admitted,

7    is the appropriate sentence in this case.

8            Will you stand, sir.

9            I've reviewed the presentence report.  I accept and

10   adopt as my findings the description of the offense and the

11   offense conduct and its calculation of the guidelines.  The

12   total offense level is 40.  The defendant's criminal history

13   category is I.

14           I accept that because the offense involved a federal

15   crime of terrorism that is enhanced to a criminal history

16   category of VI.  I accept and adopt as my findings the

17   offender's characteristics, which are set forth beginning at

18   paragraph 63 of the presentence report.

19           I have considered all of the Section 3553(a) factors.

20   Given the nature of this offense and the circumstances under

21   which it was committed, I believe that that outweighs any

22   consideration of the history and the characteristics of the

23   defendant, and that the need to punish this crime and to send a

24   message that this sort of behavior will not be tolerated

25   outweighs any other consideration set forth in the sentencing

I21WjabS

1  statute and informs my decision to impose a guidelines

2  sentence.

3          Accordingly, under docket No. S1 13 Cr. 485-01, at

4  total offense level 40 and criminal history category VI, I

5  hereby, as recommended by the department of probation, sentence

6  you to be remanded to the custody of the attorney general of

7  the United States and the Bureau of Prisons for a term of 180

8  months.

9          I am not imposing a term of supervised release on the

10 defendant.

11         The probation department does not recommend a fine,

12 and I'm not imposing a fine.

13         Restitution is not applicable.

14         I understand that there is a consent preliminary order

15 of forfeiture that will be entered in this case.

16         Is that correct, Mr. Turner?

17         MR. TURNER:  Yes, Judge.

18         THE COURT:  And I'm imposing a special assessment of

19 $100, which is due and payable immediately.

20         You may be seated.

21         Counsel, are there any recommendations that you wish

22 me to make concerning place of incarceration?

23         MR. SCHACHT:  Yes, your Honor.

24         My client, as you know from the materials you've read,

25 is availing himself of the medical treatment that the Bureau of

I21WjabS

1    Prisons affords, so I would simply ask that you recommend --

2    they would probably do this in any event -- that he be

3    designated to a place that gives him the most appropriate

4    medical treatment consistent with his needs.

5             THE COURT:  The defendant has some significant medical

6    issues, and the Bureau of Prisons needs to take that into

7    account in designating him.  It is, in the opinion of the

8    Court, imperative that the Bureau of Prisons consider whether

9    this defendant belongs in a medical facility.  I can't make

10   that recommendation, because I'm not a doctor, but the nature

11   of the charges should not, and the crime of conviction should

12   not, in the view of this Court, be entirely determinative if

13   there are medical issues that need to be addressed.

14            MR. SCHACHT:  Thank you.

15            THE COURT:  I have before me a consent preliminary

16   order of forfeiture and money judgment.

17            Mr. Turner, is this signed by you on behalf of

18   Mr. Berman?

19            MR. TURNER:  Yes, it is, your Honor.

20            THE COURT:  Mr. Schacht, have you signed this

21   document?

22            MR. SCHACHT:  Yes.  My client and I just signed it

23   this afternoon.

24            THE COURT:  Mr. Jaber, I have a document which has a

25   signature above your name.  Is that your signature, sir?

I21WjabS

1          THE DEFENDANT:  Yes.

2          THE COURT:  Did you put your signature on this

3    document?

4          THE DEFENDANT:  Yes.

5          THE COURT:  OK.  When did that, did anyone force you

6    to do it?  Did you do that of your own free will?

7          THE DEFENDANT:  No.

8          THE COURT:  No one forced you to do it?

9          THE DEFENDANT:  No.

10          THE COURT:  OK.

11          Therefore, as a result of the offense charged in Count

12    Three of the indictment to which the defendant has pled guilty,

13    a money judgment in the amount of $14,000 in United States

14    currency, representing the amount of proceeds traceable to the

15    offense charged in Count Three of the indictment that the

16    defendant personally obtained, shall be entered against the

17    defendant.  Pursuant to Rule 32.2(b)(4) of the Federal Rules of

18    Criminal Procedure, this consent preliminary order of

19    forfeiture and money judgment is final as to you, Faouzi Jaber.

20    It shall be deemed part of your sentence and included in the

21    judgment of conviction therewith.

22          All payments on the outstanding money judgment shall

23    be made by postal money order, bank or certified check, made

24    payable in this instance to the United States Marshals Service

25    and delivered by mail to the United States Attorney's Office

I21WjabS

1    for the Southern District New York, attention money laundering

2    and asset forfeiture unit.

3           The United States Marshals Service is authorized to

4    deposit the money judgment in the asset forfeiture fund, and

5    the United States shall retain title to such forfeited

6    property.  Pursuant to Title 21, United States Code Section

7    853(p), the United States is authorized to seek forfeiture of

8    substitute assets of the defendant up to the uncollected amount

9    of the money judgment, and because this is a judgment of

10   forfeiture and not restitution, it is not a criminal financial

11   penalty, and it is therefore not deductible from the

12   defendant's prison wages.

13          Pursuant to Rule 32.2(b)(3) of the Federal Rules of

14   Criminal Procedure, the United States Attorney's Office is

15   authorized to conduct any discovery needed to identify, locate

16   or dispose of the forfeitable property; and the Court retains

17   jurisdiction to award consent preliminary order of forfeiture

18   and money judgment and to amend it as necessary.

19          I am signing this document at 5:40 p.m. on the 1st of

20   February 2018.

21          You may be seated, sir.

22          Was there an appeal waiver in this case?

23          MR. TURNER:  Yes, your Honor, there is.

24          THE COURT:  And that was to 15 years?

25          MR. TURNER:  It was to any sentence at or below 180

I21WjabS

1    months.

2         THE COURT:  At or below 180 months.

3         Mr. Jaber, do you recall that at the time you pled

4    guilty, you also signed a letter that was provided by the

5    government?

6         THE DEFENDANT:  No.  I forgot.

7         THE COURT:  Does anyone have a copy of the letter to

8    show him?

9         Thank you, Mr. Turner.

10        MR. SCHACHT:  Yes, your Honor.  He remembers the plea

11   agreement.  He was confused.  He was thinking about some other

12   letter.

13        THE COURT:  It's OK.  It's the letter that was signed

14   at the time of the plea.

15        Is that your signature on the letter?

16        THE DEFENDANT:  Yes, it is.

17        THE COURT:  And did you sign the letter of your own

18   free will?

19        THE DEFENDANT:  No.

20        THE COURT:  No, you did not?  Someone forced you to

21   sign the letter?  Did someone threaten you to get you to sign

22   the letter?

23        (Counsel conferred with defendant)

24        THE DEFENDANT:  Sabrina forced me.

25        THE COURT:  She did?  She forced you?  The attorney

I21WjabS

1   Sabrina?

2            (Counsel conferred with defendant)

3            THE COURT:  I didn't ask whether she advised you that

4   it was in your best interest.  I asked you whether she

5   threatened you or coerced you.

6            THE DEFENDANT:  No, no, no, no.

7            THE COURT:  No, no.  She just advised you that it was

8   in your best interest to do it, am I correct?

9            THE DEFENDANT:  Yes.

10           THE COURT:  All right.  And you did sign it, is that

11  correct?

12           THE DEFENDANT:  Yes.

13           THE COURT:  In the letter, it said that if I sentenced

14  you to 180 months -- 15 years -- or less, you would not take an

15  appeal from your sentence or file any lawsuit contesting the

16  legality of your sentence.  Do you recall that?

17           THE DEFENDANT:  Correct.

18           THE COURT:  Did the attorney Sabrina discuss that with

19  you?

20           THE DEFENDANT:  Yes, she did.

21           THE COURT:  OK.  So you knew that was in the letter

22  when you signed it, is that correct?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Well, I've sentenced you to 180 months, 15

25  years, and it's my understanding that by signing the letter,

I21WjabS

1   you have waived your right to take an appeal from your

2   sentence.  Is that also your understanding?

3              THE DEFENDANT:  Yes.

4              THE COURT:  OK.  Have a seat.

5              Is there anything else from the defense?

6              MR. SCHACHT:  No.  Thank you, your Honor.

7              THE COURT:  Mr. Schacht, I thank you kindly.  You came

8   in at the very end of the case, and I thank you for the careful

9   attention you've given to the case and for the excellent

10  presentation that you've made on behalf of your client.

11             MR. SCHACHT:  Thank you, your Honor.

12             THE COURT:  Mr. Turner, is there anything else from

13  the government?

14             MR. TURNER:  One housekeeping item, your Honor.

15             We would move that the open counts in both the initial

16  indictment as well as the superseding indictment be dismissed,

17  your Honor.

18             THE COURT:  All open counts against Mr. Jaber are

19  dismissed.

20             These proceedings are closed.

21             (Adjourned)

22

23

24

25